HERMAN JONES vs. COMMONWEALTH.

Suffolk.   December 13, 1978. — April 13, 1979.

Present: HALE, C.J., ROSE, & BROWN, JJ.

*Constitutional Law*, Double jeopardy. *Practice, Criminal*, Double jeop-
ardy, Mistrial.

Where a defendant moved for a mistrial at the inception of trial based
on specific incidents occurring during impanelment of the jury and
the judge subsequently granted a mistrial after the Commonwealth
and the defendant had rested based in large part on events transpir-
ing during the presentation of a codefendant's case and where the
defendant's counsel, on being apprised of the judge's intention to
declare a mistrial, unequivocally expressed a desire to continue,
stating his belief that any prejudice against the defendant as a
result of the earlier incidents had since abated, the defendant's
earlier motion did not operate as consent to the judge's later decla-
ration of a mistrial. [389-391]
Declaration of a mistrial sua sponte was a proper exercise of a judge's
discretion even though it was based in large part on events transpir-
ing during the presentation of a codefendant's case after the defend-
ant and the Commonwealth had rested, where the probability of
prejudice extending to the defendant constituted a manifest neces-
sity for the mistrial. [392-396]
Even though the judge at a criminal trial contributed to events which
led to his declaration of a mistrial sua sponte, retrial of the defend-
ant was not barred by the constitutional prohibition against double
jeopardy where the record disclosed no evidence of judicial over-
reaching, bad faith, or intentional manipulation of events to the
defendant's detriment. [396-397]

CIVIL ACTION commenced in the Supreme Judicial
Court for the county of Suffolk on September 25, 1978.

On transfer to the Appeals Court the case was reported
by *Grant*, J.

*Willie J. Davis* for Herman Jones.

*Jeremiah P. Sullivan, Jr.,* Assistant District Attorney, for the Commonwealth.

ROSE, J. The question reported to us by the single justice for resolution in this case is whether the Commonwealth is barred by the double jeopardy clause of the Fifth Amendment to the Constitution of the United States from proceeding with the trial of Jones (hereinaf-ter the defendant) on the criminal indictments at issue, or, alternatively, whether the record as a whole reveals that there was "manifest necessity" for the mistrial granted by the trial judge over the objection of the defendant. We conclude that there is no bar to a retrial of the defendant.

Herman Jones, the defendant, was indicted and tried in the Superior Court with a codefendant, Frank Rivera, on the following charges: murder of one William Dowling; robbery of William Dowling; assault with intent to rob and robbery of one George Miller; and assault and battery by means of a dangerous weapon on George Miller. At the close of the Commonwealth's case, the judge allowed the defendant's motions for directed verdicts on the indictments relating to George Miller. The defendant then presented his case and rested. Subsequently, during presentation of the codefendant's case, circumstances arose which led the judge to declare a mistrial. The defendant's motion to dismiss the remaining indictments on the basis of double jeopardy was denied by the judge. The defendant petitioned the Supreme Judicial Court, invoking its powers under G. L. c. 211, § 3, and the matter was transferred to a single justice of the Appeals Court for a hearing on the issue of double jeopardy. The matter was thereafter reserved and reported to a panel of this court.

The circumstances giving rise to the declaration of a mistrial were as follows. Beginning at the jury impanelment, and continuing throughout the trial, a series of verbal exchanges occurred between counsel for both defendants and the judge. After the jury had been selected and trial had commenced, both counsel moved orally for

a mistrial, on the ground that comments made by the judge during the impanelment in the presence of prospective jurors had prejudiced the jury against the defendants.[1] These motions were denied by the judge at the time, but a written motion for mistrial subsequently submitted by the defendant was taken under advisement by the judge. In his written motion, the defendant argued that the judge had made light of certain questions submitted by the defendants to be asked of prospective jurors;[2] had commented disparagingly about grammar used by counsel in those questions;[3] had made prejudicial remarks casting doubt upon the seriousness of counsel;[4] and had

---

[1] Set forth below are representative examples selected from the transcript of the colloquies which took place during the impanelment. See notes 2 to 5, below.

[2] THE COURT (reading questions submitted by Mr. Davis, defense counsel): " 'Has any member of your immediate family or a close personal friend you consider to be like a brother or sister'—Does that mean strictly, Mr. Davis or in the colloquial sense?"
MR. DAVIS: "Colloquial."
THE COURT: " '. . . ever been the victim of a violent crime,' brothers and sisters as we all are, I assume? May we include ourselves?"

[3] THE COURT: "[T]his is ungrammatical, whoever prepared this, Mr. Davis."
. . . .
THE COURT: "Do you press this [question]?"
MR. DAVIS: "Yes, your Honor, to read verbatim. I will press each one right down to every comma."
THE COURT: "Well, if we are going to get into commas, I would like to see you after court, and I will show you where a few are misplaced."

[4] MR. NUGENT (counsel for codefendant): "May we have the Court's indulgence for a moment, please—a few moments, I should say?"
THE COURT: "As long as you are not discussing your lunch."
. . . .
THE COURT (to Mr. Nugent): "You cannot hear if you are going to enjoy chitchat with Mr. Davis . . . . I assume, Mr. Davis, it's a very serious matter; you seem to have a great smile on your face."
MR. NUGENT: "Your Honor, I object to that remark."
THE COURT: "You do?"
MR. NUGENT: "Yes, and take exception to it."
. . . .
THE COURT: "Mr. Nugent, you're turning the wrong ear. It's the other ear."
MR. NUGENT: "It's the same."

implied that counsel was not competent.[5]

After trial commenced, the proceedings were punctuated by colloquies and confrontations between the judge and Alfred E. Nugent, counsel for the codefendant, during Mr. Nugent's examination of witnesses. The judge's comments included directives to counsel to expedite proceedings by avoiding repetitive questions, direct questioning of witnesses by the judge, and remarks critical of counsel's skills.[6] The judge, in a bench conference, threat-

THE COURT: "I see. Perhaps you hear through the back."

. . . .

THE COURT: "Okay. I'm not worried about your ears."

. . . .

MR. NUGENT: "May I consult with Mr. Davis now, your Honor please?"

THE COURT: "How can I stop you? . . . I hope you were talking about pertinent matters here, that's all."

. . . .

MR. NUGENT; "Your Honor, we have not completed our discussion."

THE COURT: "Well, you've completed it as far as I am concerned. Get back to your counsel seat."

MR. NUGENT: "Exception."

THE COURT: "Note your exception."

. . . .

THE COURT: "I am not going to permit exchanged glances or muggings of any nature. I want that understood. Is it? If it's not, we'll see you when court adjourns."

[5] MR. NUGENT: "May I chat with learned counsel?"

THE COURT: "I believe you checked with Mr. Davis, if he qualifies to that appellation."

MR. DAVIS: "Your Honor, I have to object to that. You and I know very well that I am very competent, and I don't want to give the jury the impression that I am not."

THE COURT: "You know something, let them listen to you. Go ahead."

[6] A representative exchange is as follows:

THE COURT: "Mr. Nugent, come on. I think you have exhausted everyone's patience. You have had this now two or three or four times. Cross-examination doesn't mean repetition."

MR. NUGENT: "Just my point of orientation, your Honor, to get back into this area. That's the only reason I'm doing it."

THE COURT: "We're the most well-oriented group in New England, but go ahead."

MR. NUGENT: "Take exception to that, your Honor. It's a very serious matter, and—"

ened to hold counsel in contempt for ignoring the judge's warnings regarding improper questioning, and also rebuked him in open court.[7] After the Commonwealth and the defendant had presented their evidence and rested (the defendant having received the court's permission to reopen when another witness became available), the conflict between the judge and Mr. Nugent became exacerbated during presentation of the codefendant's case. The judge admonished Mr. Nugent repeatedly in open court against asking leading questions during his direct examination of the codefendant. Finally, the judge sharply rebuked the codefendant for interjecting a statement while the judge was discussing the admissibility of an answer with Mr. Nugent.[8] The judge thereupon ordered the jury to take a recess.

THE COURT: "Don't you make any speeches here, sir. Address your next question, something new. Move it along. No more statements, Mr. Nugent."

MR. NUGENT: "Note my exception, please."

. . . .

THE COURT: "Next question."

MR. NUGENT: "Can the stenographer read back?"

THE COURT: "No. Next question."

MR. NUGENT: "No?"

THE COURT: "No. Save your exception."

MR. NUGENT: "Exception."

THE COURT: "Next question. I'm sure in that short length of time you haven't forgotten the last question, or perhaps you have."

MR. NUGENT: "I have."

THE COURT: "I am sorry you have. You will have to start on a new one. Perhaps it might be beneficial to all of us. Go ahead."

MR. NUGENT: "May I see the Court at the side bench?"

THE COURT: "No. Let's go."

[7] MR. NUGENT: "May I see the Court at the side bench?"

THE COURT: "No, you may not, Mr. Nugent."

MR. NUGENT: "Note my exception, please."

THE COURT: "One more request, Mr. Nugent, for a side bench conference, and I will treat you summarily. Now, that's it, and I'll note your exception."

[8] RIVERA (in response to Mr. Nugent's question): "They [the police] pulled him over to the car, and they put him in the car and took him to Dudley Station, Station Two."

THE COURT: "Were you with them?"

RIVERA: "No."

At this juncture, counsel for the codefendant moved for a mistrial. The judge allowed the motion. When counsel for the defendant stated that he did not want a mistrial, the court informed him that the motion filed earlier by the defendant had been taken under advisement and the court was now allowing it. Counsel objected vigorously, attempting to waive that earlier motion, but the judge stated that it had not been waived before he had allowed it. Counsel emphasized that the earlier motion had been based on events transpiring during the selection of the jury, the prejudicial effect of which had since abated, whereas the codefendant's motion, allowed by the judge, was based on different matters. The judge expressed his concern that both defendants may have been prejudiced by the occurrences at trial:

"Beyond you, Mr. Davis, and beyond Mr. Nugent, and beyond me and beyond everybody stand Rivera and Jones, and right now I'll take my share of it. Things have got out of hand and perhaps they were from the beginning, so with that in mind, I allow both your motions which were filed."

The judge granted a motion by the defendant to sever, but upon reconsideration, denied the motion the following day. Upon discharging the jury, the judge explained that

"at the outset of this trial certain motions were filed by counsel, motions for mistrial, because of various exchanges, if you will, between counsel and me, and I took

---

THE COURT: "Oh. Then we'll exclude that."

MR. NUGENT: "You want to exclude that part he saw them get in the car?"

THE COURT: "He didn't say he saw them get in the car."

RIVERA: "*Yes, I did.*"

THE COURT: "*Mister, you keep your mouth shut when I'm talking to Mr. Nugent.* Mr. Nugent, come over here. Jurors, go upstairs, and we're going to finish this testimony today, so take your recess." (Emphasis supplied.)

(Recess)

those motions under advisement, and as the trial progressed, I think that there have been issues introduced into this case that might hurt you or hinder you in the determination of the sole issue of this case, which is the guilt or innocence of these defendants. I take no small part of it myself for impatience, and perhaps interfering, but on the chance that you might have feelings one way or another, whether you dislike the judge or dislike the lawyers or what have you, I'm going to allow a mistrial. . . . I am concerned there are issues in here that might disturb you, other than the main issue, which is, did the defendants commit these crimes. So there will be a mistrial and scheduling at another day.

"So, I'm sorry and I know you are, but I think . . . the ends of justice would be much better served if perhaps a different court heard these matters. All right. Thank you very much."

In light of this factual background, we turn to an analysis of the issues involved in this case.

## I.

The Fifth Amendment's prohibition against placing a defendant "twice in jeopardy" (made applicable to the States by *Benton* v. *Maryland*, 395 U.S. 784 [1969] represents a constitutional policy of finality for a defendant's benefit in criminal proceedings. *United States* v. *Jorn*, 400 U.S. 470, 479 (1971) (plurality opinion). *United States* v. *Scott*, 437 U.S. 82, 92 (1978). This Commonwealth has long had a common law rule against placing a defendant twice in jeopardy. *Thames* v. *Commonwealth*, 365 Mass. 477, 479 (1974), and cases cited therein. See also G. L. c. 263, §§ 7, 8, & 8A. This prohibition reflects societal awareness that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety

and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green* v. *United States,* 355 U.S. 184, 187-188 (1957). *Costarelli* v. *Commonwealth,* 374 Mass. 677, 680 (1978). Retrial is not automatically barred, however, when a criminal proceeding is terminated due to some overriding necessity before a final resolution is reached on the merits of the charges against a defendant. See *United States* v. *Scott, supra* at 92. Before a defendant can be retried, the Commonwealth must demonstrate that there was "manifest necessity" for the mistrial declared without the defendant's consent. *Arizona* v. *Washington,* 434 U.S. 497, 505 (1978). See *Thames* v. *Commonwealth, supra* at 479; *Commonwealth* v. *Clemmons,* 370 Mass. 288, 292-293 (1976). See generally Schulhofer, Jeopardy and Mistrials, 125 U. Pa. L. Rev. 449 (1977); Note, Double Jeopardy: The Reprosecution Problem, 77 Harv. L. Rev. 1272, 1276-1281 (1964); Note, Mistrial and Double Jeopardy, 49 N.Y.U.L. Rev. 937, 939-956 (1974).

A crucial factor in our analysis on the question reported to us (whether the Commonwealth is barred by the double jeopardy clause from further prosecution) is whether the mistrial was declared pursuant to the defendant's motion or over his objection, since a clear distinction lies between mistrials declared with the defendant's consent, and those declared by the judge sua sponte. See *United States* v. *Dinitz,* 424 U.S. 600, 606-608 (1976); *Lee* v. *United States,* 432 U.S. 23, 31-33 (1977); *United States* v. *Evers,* 569 F.2d 876, 878 (5th Cir. 1978); *Drayton* v. *Hayes,* 589 F.2d 117, 121 (2d Cir. 1979). Ordinarily, a request by a defendant for a mistrial is assumed to remove any barrier to reprosecution, absent evidence of prosecutorial or judicial overreaching or bad faith. *United States* v. *Jorn, supra* at 485. *United States* v. *Dinitz, supra* at 607. *Lee* v. *United States, supra* at 32-33. Cases in which the defendant does not consent to a mistrial are governed by the "manifest necessity" standard.

We think that in the circumstances of this case the mistrial should be treated as one declared sua sponte by the judge, despite his pronouncement that he was acting upon the defendant's written motion filed at the inception of trial. We see no reason to bind the defendant to that motion. See *Russo* v. *Superior Court*, 483 F.2d 7, 17 (3d Cir.), cert, denied, 414 U.S. 1023 (1973). The motion had been based on specific events occurring at an earlier stage in the proceedings. Our examination of the record indicates that the mistrial declared by the judge appears to have been based in large part upon events transpiring at trial after the Commonwealth and the defendant had rested, events primarily involving the judge and codefendant's counsel. Furthermore, the defendant's counsel made his changed position clear to the judge immediately upon being apprised of the judge's intended action, and he unequivocally expressed a desire to continue with that particular jury, stating his belief that any prejudice against the defendant which might have existed in the jurors' minds had since abated. This case is appreciably different from those cases in which courts have found implied consent by defendants to declarations of mistrials based upon a "totality of the circumstances." Contrast *United States* v. *Goldstein*, 479 F.2d 1061, 1066-1068 (2d Cir.), cert. denied, 414 U.S. 873 (1973); *United States* v. *Pappas*, 445 F.2d 1194, 1199-1200 (3d Cir.), cert. denied sub nom. *Mischlich* v. *United States*, 404 U.S. 984 (1971); *United States* v. *Gentile*, 525 F.2d 252, 253-258 (2d Cir. 1975), cert. denied, 425 U.S. 903 (1976); *United States* v. *Crouch*, 566 F.2d 1311, 1315-1316 (5th Cir. 1978).

We conclude that the judge's revival of the motion made by the defendant earlier in the trial for specified reasons did not operate as consent by the defendant to the judge's declaration of a mistrial in substantially different circumstances. Thus, the defendant is not barred from raising a valid double jeopardy claim. We next turn to the question whether the record reveals that there was "manifest necessity" for the judge's action.

## II.

The "manifest necessity" standard was first articulated in *United States* v. *Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824), by Mr. Justice Story:

"[I]n all cases of this nature, the law has invested Courts of Justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere."

It has consistently been applied by the United States Supreme Court as a standard of appellate review for testing a trial judge's exercise of his discretion in declaring a mistrial without a defendant's consent. *United States* v. *Jorn, supra* at 481. The doctrine "stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *Id.* at 485. Under *Arizona* v. *Washington, supra* at 516-517, an explicit finding by the trial judge of "manifest necessity" need not be made. An appellate court may review the record to see if it adequately discloses the basis for the mistrial ruling. Unless the declaration of a mistrial arose out of "manifest necessity,"[9] the defendant has been deprived of the right to pursue a trial to a conclusion before the original tribunal. The defendant's right, however, is

---

[9] In explaining the extent of the State's burden, the Supreme Court has stated that the word "necessity" is not to be interpreted literally. "[W]e assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Arizona* v. *Washington, supra* at 506 & n.21. Thus, the phrase "manifest necessity" is taken to mean a "high degree of need" rather than an "irresistible compulsion." *Arizona* v. *Washington, supra* at 507 n.21, quoting from *Winsor* v. *The Queen*, L.R. 1 Q.B. 289, 390, 394 (1866).

not absolute, and "must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade* v. *Hunter,* 336 U.S. 684, 689 (1949). See *Scott* v. *United States, supra* at 92; *Commonwealth* v. *Clemmons, supra* at 292, and cases cited. The Supreme Court has rejected application of any mechanical formula by which to judge the propriety of declaring a mistrial "in the varying and often unique situations arising during the course of a criminal trial." *Illinois* v. *Somerville,* 410 U.S. 458, 462 (1973). Rather, cases are to turn on their "particular facts." *Id.* at 464.

The key issue here is whether the judge properly exercised his discretion in aborting the proceedings, over the defendant's objection, in response to a situation created in part by the judge and codefendant's counsel. The record reveals that the basis for the judge's action was the potentially prejudicial impact on the jury of the incidents at trial. Having considered all the events as shown by the record, we are of the opinion that the judge correctly discerned the development of a situation in which a fair trial for either defendant, and the Commonwealth as well, could no longer have been obtained. In the judge's opinion, as he stated to the jury,[10] the occurrences at trial may have had a deleterious effect on the ability of the jury to appraise the defendants' guilt or innocence with that impartiality required in every criminal trial. In addition to exchanges between the judge and both counsel during the jury impanelment in the presence of the venire, the jury had been exposed to altercations during trial between the judge and the codefendant's counsel and, in our view the most serious occurrence, the judge's display of marked impatience towards the codefendant himself.

---

[10] "I think that there have been issues introduced into this case that might hurt you or hinder you in the determination of the sole issue of this case, which is the guilt or innocence of these defendants."

Even in cases where there is no evidence of actual juror bias, courts have taken the position that the possibility of bias will justify a mistrial. *Arizona* v. *Washington, supra* at 512. See *Simmons* v. *United States*, 142 U.S. 148, 154 (1891); *Thompson* v. *United States*, 155 U.S. 271, 273-274 (1894); *Illinois* v. *Somerville, supra* at 470, citing *Wade* v. *Hunter, supra* at 688-689; *United States* v. *Giles*, 19 F. Supp. 1009 (W.D. Okla. 1937) (remarks by trial judge potentially prejudicial either to the defendants or to the government; held: declaration of mistrial sua sponte was a proper exercise of the judge's discretion). In such cases, courts ordinarily accord the highest degree of respect to a trial judge's evaluation of the possible impact on the jury of occurrences at trial which may impair the jury's ability to render an impartial verdict. "There are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias. He has seen and heard the jurors . . . . He is the judge most familiar with the evidence and the background of the case on trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he is far more 'conversant with factors relevant to the determination' than any reviewing court can possibly be." *Arizona* v. *Washington, supra* at 513-514, quoting from *Wade* v. *Hunter, supra* at 689.

Taken together, we think that the events at trial disclosed by the record support the conclusion that there was a "high degree" of necessity for the mistrial. *Arizona* v. *Washington, supra* at 506. Along the "spectrum of trial problems which may warrant a mistrial," *id.* at 510, the case under review falls into an area more difficult than others for appellate courts to scrutinize, involving as it does the trial judge's evaluation of the jurors' perception of events as they unfolded before the jury and the extent to which they diverted the jury from their task of rendering a fair and impartial verdict. While the trial judge is best situated to appraise the dynamics of the trial pro-

ceedings as they may affect the jury, in the circumstances of this case we believe that the court has the responsibility independently to appraise the situation as it is revealed by the record, apart from the trial judge's evaluation. This we have done, and conclude that there was manifest necessity for the mistrial.

The defendant argues that the mistrial was not "necessary" since a less drastic alternative in the form of severance was available to the judge. We disagree. Even if some of the events at trial which precipitated the mistrial did not directly involve the defendant or his counsel, it was probable that the prejudicial impact of those events on jurors' minds extended to the defendant as well. The judge properly declined to grant a severance in this situation which may have involved a carry-over effect prejudicial to the defendant. See *Scott* v. *United States*, 202 F.2d 354, 355 (D.C. Cir.), cert. denied, 344 U.S. 879, and sub nom. *Bayne* v. *United States*, 344 U.S. 881 (1952). Contrast *United States* v. *Beasley*, 491 F.2d 507 (6th Cir.), cert. denied sub nom. *Thomas* v. *Beasley*, 417 U.S. 955 (1974); *United States* v. *Alford*, 516 F.2d 941 (5th Cir. 1975). Nor is the defendant aided by *United States* v. *Pierce*, 593 F.2d 415 (1st Cir. 1979), in which the court held that a trial judge's declaration of a mistrial was improper, since a less drastic alternative had been available. In that case, several jurors had learned from an outsider, the husband of one of the jurors, that attorneys for the defendants had attempted during a voir dire hearing to suppress certain evidence, that they had tried to have the indictment dismissed, and that they were trying to "work something out" with the judge. *Id.* at 416. The basis for the court's holding was its conclusion, from the record, that the taint involved had caused no actual prejudice to the defendants and would have become insignificant upon a decision by the trial judge to admit the evidence and upon appropriate instructions to the jury. We cannot reach a similar conclusion here, based on the record before us. We believe that the taint involved in this case was of a far more

pervasive nature, affecting the entire panel, and could not, we think, have been remedied by curative instructions. Taking all circumstances into account, we hold that a mistrial was justified by a high degree of necessity. Contrast *United States* v. *Jorn, supra* at 486-487.

### III.

This conclusion does not end our inquiry. The judge here was faced with a situation which, in his own words, had "gotten out of hand," and to which, by his own admission, he had contributed. Through his remarks and exchanges with counsel, it would appear that the judge himself played a role in triggering the events which led to the mistrial ruling. For this reason, we must scrutinize the record for any evidence of judicial overreaching, bad faith, or intentional manipulation of events to the defendant's detriment, in which case retrial would be barred. See *Downum* v. *United States*, 372 U.S. 734, 736 (1963); *United States* v. *Jorn, supra* at 485; *United States* v. *Dinitz, supra* at 611; *Lee* v. *United States, supra* at 32-33; *Arizona* v. *Washington, supra* at 508. Absent evidence of bad faith or overreaching, we believe that the fact of a judge's own contribution to an unfortunate situation which necessitates a mistrial is not, by itself, enough to mandate a per se rule prohibiting retrial of a defendant who objects to the mistrial.

We find no such evidence here. The record does not show that the judge's actions were "motivated by bad faith or undertaken to harass or prejudice" the defendant. *United States* v. *Dinitz, supra* at 611. It is clear from those cases involving judicial or prosecutorial errors which gave rise to the defendants' requests for mistrials that mere negligence (see *Lee* v. *United States, supra* at 34) or inadvertent conduct will not suffice for a finding of overreaching or bad faith, though intentional misconduct may. See *United States* v. *Kessler*, 530 F.2d 1246, 1256-1258 (5th Cir. 1976). Compare *Drayton* v. *Hayes, supra* at

119 (at the trial judge's suggestion, the prosecuting attorney pretended to call rebuttal witnesses as a joke on defendant's lawyer; held: judge's misconduct did not amount to bad faith, where record did not show any motivation on judge's part to prejudice or harass the defendant, and where the defendant did not suffer actual prejudice). The defendant here does not argue, nor is there evidence before us to indicate, that the judge intentionally manipulated events so as to precipitate a mistrial, or that he was motivated by any ill will toward either defendant. Nor can we say, based on the record, that counsel for the two defendants did not contribute in some measure and in varying degree to the atmosphere and dynamics at the pretrial and trial proceedings which led to the judge's determination to declare a mistrial. We are convinced that the judge's stated reason for aborting the proceedings was genuine; namely, that the cumulative effect of occurrences at trial may have had a prejudicial impact on the jurors, creating, in the judge's opinion, a real and abiding doubt as to their impartiality. In these circumstances, his action was not only justified, but required (see *United States* v. *Giles, supra* at 1013) in order to safeguard to the defendant his right to a fair trial. See *Commonwealth* v. *Cronin*, 257 Mass. 535, 537 (1926); *Commonwealth* v. *Juliano*, 358 Mass. 465, 467 (1970).

To the question reported to us we respond that, based upon our review of the record, there was "manifest necessity" for the mistrial. The Commonwealth is therefore not barred from proceeding with the trial of the defendant on the indictments at issue. Further proceedings are to be had in the Superior Court on indictments Nos. 015585 and 015587.

*So ordered.*